UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
FREDERICK OGIRRI,                                  :
                                                   :
                      Plaintiff,                   :
                                                   :          **OPINION AND ORDER**
          -against-                                :
                                                   :          16–CV–9143 (JLC)
NANCY A. BERRYHILL,                                :
Acting Commissioner, Social Security              :
Administration,[1]                                 :
                                                   :
                      Defendant.                   :
-------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Frederick Ogirri brings this action seeking judicial review of a final

decision by defendant Nancy A. Berryhill, the Acting Commissioner of the Social

Security Administration (the "Commissioner"), denying Ogirri's claim for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Ogirri has

moved and the Commissioner has cross-moved for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set

forth below, the case is remanded to the Commissioner for further proceedings

pursuant to sentence four of 42 U.S.C. § 405(g).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of the Social Security
Administration.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure,
Berryhill is hereby substituted for former Acting Commissioner Carolyn W. Colvin
as the defendant in this action.

# I.    BACKGROUND

## A.    Procedural History

Ogirri filed an application for DIB on December 17, 2012, and an application for SSI on March 24, 2014, alleging in both a disability onset date of August 1, 2012. Administrative Record ("AR"), dated Apr. 12, 2017, Dkt. No. 7, at 12.  The Social Security Administration ("SSA") denied Ogirri's application on April 3, 2013.  *Id*. at 106–08.  On May 15, 2013, Ogirri requested an administrative hearing, *id*. at 109, and on May 14, 2014, represented by counsel, Ogirri appeared before Administrative Law Judge ("ALJ") Gal Lahat.  *Id*. at 41–93.  In a written decision dated July 25, 2014, the ALJ found that Ogirri was not disabled.  *Id*. at 12–24. Ogirri requested review by the SSA Appeals Council on August 12, 2014, *id*. at 8, and submitted additional medical evidence generated after the ALJ's decision, *id*. at 40.  On November 19, 2015 the Appeals Council denied Ogirri's request for a review of the decision, thus rendering the ALJ's decision final.  *Id*. at 1–4.

Represented by counsel, Ogirri timely commenced this action on November 23, 2016, seeking judicial review of the Commissioner's decision under 42 U.S.C. § 405(g).  Complaint, Dkt. No. 1.[2]  On June 12, 2017, Ogirri moved for judgment on the pleadings, Dkt. No. 8, and filed a memorandum in support of his motion ("Pl. Mem."), Dkt. No. 9.  On July 28, 2017, the Commissioner cross-moved for judgment, Dkt. No. 14, and filed her own supporting memorandum of law ("Def. Mem."), Dkt.

---

[2] On September 26, 2016, the Appeals Council granted Ogirri an additional 60 days to file a civil action, starting from the date he received the letter granting the extension.  AR. at 31.

No. 15. No reply papers were submitted. On June 21, 2017, the parties consented to my jurisdiction for all purposes under 28 U.S.C. § 636(c). Dkt. No. 13.

## B. The Administrative Record

### 1. Ogirri's Background

Ogirri was born on April 9, 1983 and was 29 years old on the alleged disability onset date. AR at 23. Ogirri worked off and on as a security guard from 2008 to 2012, prior to which he had worked in a mailroom and in a warehouse. *Id*. at 58–59, 102. Ogirri alleges a number of impairments that limit his ability to work. In his DIB application he claimed he became unable to work on August 1, 2012 due to cerebellar atrophy,[3] balance and coordination loss, and arthritis. *Id*. at 190. He believes that an assault in 2008, which resulted in a head injury, caused his disabilities. *Id*. at 48, 252, 294. Ogirri has been treated by a number of doctors for his conditions. *Id*. at 17–20. As discussed in the next section of this opinion, multiple doctors have diagnosed Ogirri with cerebellar atrophy.

Ogirri testified at the May 14, 2014 hearing that he lives with his brother and two other roommates and that he is engaged. *Id*. at 52. He reported that he graduated from Queensborough Community College in December 2013, but that he had "a lot of trouble" obtaining his degree because his impairments caused him difficulty traveling to and accessing the classrooms. *Id*. at 52, 76–77. At his

---

[3] According to Ogirri, "[c]erebellar degeneration is a process in which neurons in the cerebellum–the area of the brain that controls coordination and balance–deteriorate and die," and the "most characteristic symptom of cerebellar degeneration is a wide-based, unsteady, lurching walk, often accompanied by a back and forth tremor in the trunk of the body." Pl. Mem. at 2.

hearing, Ogirri testified that he has trouble sitting, standing, and walking. *Id.* at 62–63. He said he could stand without his cane for 20 minutes at most, and could walk with his cane for two blocks at most. *Id.* He reported that he could lift a gallon of milk with both hands, but could not do so while standing up. *Id.* at 63–64. His fiancée helps him with household chores like doing the laundry, making his bed, and preparing food. *Id.* at 64. He also testified that he has problems with writing and typing. *Id.* at 65–66.

### 2. Relevant Medical Evidence on Record

As Ogirri does not dispute the ALJ's findings regarding his mental impairments, Pl. Mem. at 2 n.5, the Court's discussion of the medical evidence primarily focuses on the evidence concerning his physical impairments, and specifically, on evidence regarding Ogirri's treatment with neurologist Dr. Winona Tse since the ALJ's failure to properly weigh Dr. Tse's opinion is the basis for the Court's remand.

### a. Treatment at Mount Sinai Hospital

Ogirri received primary care treatment as well as specialized treatment from multiple doctors at Mount Sinai Hospital in 2013 and 2014. *See, e.g.*, AR. 244–47; 291–336; 352–403; 406–09; 446–564; 575–88.[4]

On July 30, 2013, Ogirri began treatment with Dr. Ferid Osmanovic, a primary care physician at Mount Sinai Hospital. *Id.* at 293–97. Dr. Osmanovic

---

[4] This Opinion does not recount all of the treatment that Ogirri received at Mount Sinai.

conducted an examination and noted atrophied muscles, an unsteady gait, and positive cerebellar signs.[5] *Id.* at 295. Dr. Osmonovic diagnosed Ogirri with cerebellar atrophy, and referred Ogirri for neurology, physiatry, orthopedic, podiatry, and cardiology consultations. *Id.* at. 295.

On August 28, 2013, Ogirri met with Dr. Aaron Tansy, a neurologist at Mount Sinai Hospital. *Id.* at 304–16. Dr. Tansy noted Ogirri's reported history of progressive difficulty with walking and accomplishing activities of daily living, as well as increased falls and difficulty with speech. *Id.* at 309. Dr. Tansy conducted a neurological examination that revealed dysarthric and hypophonic speech as well as absent pathological reflexes, and he ordered an MRI of Ogirri's brain. *Id.* at 306, 313, 321. Dr. Tansy discussed treatment options and expectations with Ogirri, and referred him to Mount Sinai's Movement Disorders Clinic and to physical therapy. *Id.* at 313–14.

On September 18, 2013, Dr. Tansy met with Ogirri again. *Id.* at 320–25. He noted no change in Ogirri's symptoms and further noted bilateral dysmetria that was worse in the left hand as well as an ataxic abnormal gait and the use of a cane. *Id.* at 321. Dr. Tansy reviewed the MRI, which showed generalized cerebellar atrophy that was marked and disproportionate to age. *Id.* at 322. Dr. Tansy diagnosed Ogirri with cerebellar degenerative disorder. *Id.* at 323. Dr. Tansy noted

---

[5] According to Ogirri, "[c]erebellar signs are a group of focal neurological signs, including an abnormal gait, difficulty with fine motor activities, an inability to perform rapid alternating movements, and speech difficulties." Pl. Mem. at 2 n.6.

that Ogirri had not yet been to the Movement Disorder Clinic, and recommended he go for treatment. *Id.* at 320, 323.

Ogirri followed up with Dr. Osmonovic on November 19, 2013 and December 2, 2013. *Id.* at 509–16, 519–25. Dr. Osmonovic took X-rays, referred Plaintiff to physical therapy and occupational therapy, and prescribed Voltaren gel. *Id.*

Ogirri returned to Dr. Tansy on January 15, 2014. *Id.* at 536–41. He conducted another neurological exam and again noted dysarthric and hypophonic speech, absent pathological reflexes, and an abnormal finger-to-nose and heel-to-shin testing. *Id.* at 538. He further noted a short-stepped gait, and an inability to perform tandem gait or heel and toe walk. *Id.* He noted that Ogirri had been seen by the Movement Disorders Clinic. *Id.* at 536.

Dr. Tansy met again with Ogirri on March 12, 2014. *Id.* at 549–53. He continued to note absent pathologic reflexes, abnormal bilateral finger-to-nose testing, abnormal bilateral heel-to-shin testing, abnormal gait requiring short steps with use of a walker, and an inability to perform tandem gait or heel and toe walk. *Id.* He noted that Ogirri had been seen again by the Movement Disorders Clinic, and that Dr. Tse had completed a disability evaluation. *Id.* at 549.

### i.    Treatment by Dr. Winona Tse

On October 28, 2013, Ogirri met for the first time with Dr. Winona Tse, a neurologist at Mount Sinai Hospital's Movement Disorders Center. *Id.* at 364–67. Dr. Tse noted that Ogirri had a four-year history of progressive incoordination, problems climbing stairs, had been using a cane for the past six months, and was

using ankle orthotics for stability. *Id.* at 364. Based on her examination, Dr. Tse noted dysarthric scanning speech, and a wide-based unsteady gait. *Id.* at 364–65. She diagnosed Ogirri with cerebellar degeneration with cerebellar dysfunction. *Id.* at 365. Dr. Tse recommended physical therapy, exercise, and a social work consult to get more home services. *Id.* at 365.

On December 3, 2013, Ogirri met with Dr. Tse for a follow up visit. *Id.* at 353. Ogirri reported that he had fallen and had begun using a walker, feeling that it was steadier than the cane he had been using. *Id.* She conducted an examination and noted that Ogirri's results for both a bilateral finger-to-nose test and bilateral heel-to-shin test were ataxic. *Id.*[6] She continued to note an unsteady wide-based gait, as well as sway when standing. *Id.* She recommended he continue with physical therapy, follow up with a social worker regarding home care services, and see an occupational therapist. *Id.* at 354.

On February 6, 2014, Ogirri met once again with Dr. Tse. *Id.* at 408. She noted that he had been attending physical therapy, that he continued to use a cane and sometimes used a walker, and that he was applying for disability benefits. *Id.* She continued to note dysarthic speech, ataxic finger-to-nose and heel-to-shin testing, and a wide-based ataxic gait. *Id.* at 408–09. Dr. Tse recommended he continue physical therapy. *Id.* at 409.

---

[6] According to the Commissioner, "[a]taxia means defective muscle coordination, especially manifested when voluntary muscle movements are attempted." Def. Mem. at 2 n.3.

That same day, Dr. Tse completed an impairment questionnaire in conjunction with Ogirri's disability application. *Id.* at 396–403. Dr. Tse wrote that she had begun to treat Ogirri on October 28, 2013, had seen him every three months since, and had diagnosed him with cerebellar degeneration. *Id.* at 396. Asked to identify the clinical findings that supported her diagnosis, Dr. Tse listed Ogirri's dysmetria on finger-to-nose and also the heel-to-shin tests, his slurred scanning speech, and his wide-based ataxic gait. *Id.* Asked to identify the diagnostic tests that supported her diagnosis, Dr. Tse noted that the August 28, 2013 MRI was consistent with marked cerebellar atrophy. *Id.* at 397. She described Ogirri's primary symptoms as "walking and balance/coordination problem[s]" and "slurred speech." *Id.* at 397.

The form asked Dr. Tse to estimate Ogirri's residual functional capacity if he were to be placed in a normal, competitive, five day a week work environment on a sustained basis. *Id.* at 398. Dr. Tse opined that in an eight-hour day Ogirri could sit for four hours and stand/walk for one hour. *Id.* at 398. She found Ogirri could sit for 30 minutes before needing to get up and move around for 30 minutes. *Id.* at 398–399. She also wrote that it was medically recommended or necessary for Ogirri not to stand or walk continuously in a work setting. *Id.* at 399. Dr. Tse further opined that Ogirri could occasionally lift and carry five to 10 pounds and frequently lift and carry up to five pounds. *Id.*

Dr. Tse opined that Ogirri had had marked limitations using his left upper extremities for manipulation, and moderate limitations using his right upper

extremities for manipulation. *Id*. at 399–400. Dr. Tse opined that Ogirri would periodically experience pain, fatigue or other symptoms severe enough to interfere with attention and concentration. *Id*. at 401. Dr. Tse estimated Ogirri's level of pain to be a seven on a scale of one to ten, and his level of fatigue to be an eight. *Id*. at 398.

Dr. Tse considered Ogirri capable of only low stress work. *Id*. at 401. He would need unscheduled 30-minute breaks three times per workday and would be absent from work more than three times a month. *Id*. at 401–02. Ogirri would need to avoid wetness, heights, pushing, pulling, kneeling, bending, and stooping. *Id*. at 402. Dr. Tse also opined that Ogirri could not work a job requiring him to keep his neck in a constant position, although his condition did not interfere with his ability to do so. *Id*. at 400–01.

In response to the question, "In your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies?" Dr. Tse wrote "Now 2/6/14," the day of the examination. *Id*. at 402.

Ogirri saw Dr. Tse again on July 15, 2014, for more than 40 minutes. *Id*. at 576–77. Dr. Tse noted that Ogirri reported his walking had become more unsteady, and that he had recently lost his balance and fallen, causing him to sprain his ankle. *Id*. at 576. Dr. Tse noted that Ogirri had stopped going to physical therapy in January due to bad weather and depressed feelings. *Id.* at 576–77. Dr. Tse continued to note ataxic finger-to-nose, and heel-to-shin testing, and a wide-based, unsteady gait, and she planned a follow up visit in three months' time. *Id*. at 577.

On November 5, 2014 (following the ALJ's decision), Dr. Tse wrote a letter in which she stated that Ogirri was under her neurologic care and was "very disabled" and "unable to work," although the Appeals Council determined that this letter contained new information about a later date in time, and "[t]herefore, it does not affect the decision about whether [Ogirri was] disabled beginning on or before July 25, 2014." *Id*. at 2, 40.

### b. SSA Consultative Examiners

#### i. Dr. David Finkelstein

On October 18, 2012, Ogirri met with Dr. David Finkelstein for a consultative examination. *Id*. at 248–50. Dr. Finkelstein observed dysarthric speech, wide-based and ataxic gait, that Ogirri could walk on his toes but not his heels, did not use an assistive device, sway but no falling, some dysmetria bilaterally in the extremities, and abnormal finger-to-nose testing. *Id*. at 249. He diagnosed cerebellar atrophy, and opined "[t]he client has limitations in speech and moderate limitations in ambulation. Also limitations in targeting the upper extremities." *Id*. at 250.

#### ii. Dr. Joyce Graber

On February 7, 2013, Ogirri met with Dr. Joyce Graber for a consultative examination. *Id*. at 256–59. Dr. Graber noted slow and unsteady gait, poor balance, inability to walk on heels and toes, ability to squat fully with difficulty getting up, some difficulty transferring on and off the exam table, no use of an assistive device, and intact hand and finger dexterity. *Id*. at 257–58. Dr. Graber

opined that "the claimant has a mild limitation for walking, climbing and other such activities due to his balance problems." *Id*. at 258.

### iii.    Dr. T. Harding

On April 2, 2013, state agency psychological consultant Dr. T. Harding reviewed the record and found that Ogirri had no medically determinable mental impairment. *Id*. at 98.

### 3.    ALJ Hearing

At the hearing before ALJ Lahat on May 14, 2014, Ogirri appeared with counsel, and both Ogirri and vocational expert Don Schader testified. *Id*. at 42–93.

### a.    Ogirri's Testimony

Regarding his physical impairments, Ogirri testified that he needed to use a walker to get around on his own. *Id*. at 75. He had been using the walker since December 2013. *Id*. at 75–76. He testified that when he sits sometimes his "back hurts a little bit like I have to lean all the way back for it not to hurt. And then when I do that my legs, you know, they're just like – it feels like my legs are just like pulling me, pulling my body forward." *Id*. at 62. He testified to having trouble standing up, and said he could stand without his cane for 20 minutes at most. *Id*. He also reported that he cannot walk without a cane, but can walk up to two blocks with one. *Id*. at 63. He testified to being unable to write legibly or type easily. *Id*. 64–65. He testified that he would not be able to maintain a 9:00 a.m. to 5:00 p.m. schedule because he does not "even wake up until 11:00 or 12:00." *Id*. at 62.

As to his medical history, Ogirri testified that Dr. Osmonovich was his primary care physician. *Id.* at 68. He also testified that he had been treated by neurologist Dr. Tansy, who referred him to Dr. Tse at the Movement Disorder Center. *Id.* He also testified regarding his treatment with Dr. Tse. *Id.* at 71.

### b. Vocational Expert's Testimony

The ALJ asked the vocational expert if jobs exist in the national economy for someone with Ogirri's age, education, and work background, with the following limitations: the person could only lift, carry, push, and pull up to 10 pounds occasionally, and less than 10 pounds frequently; stand and walk for a total of two hours out of eight; sit for a total of six hours out of eight; no climbing ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch, crawl, climb ramps, and climb stairs. *Id.* at 83–84. The vocational expert testified that such an individual could not perform Ogirri's past work, but could work as a document preparer, charge account clerk, and food and beverage order clerk. *Id.* at 83–85.

Ogirri's attorney posed four additional hypothetical individuals, and the vocational expert testified that each such hypothetical individual could not perform any jobs in the economy. *Id.* at 86–89.

## II. DISCUSSION

### A. Standard of Review

#### 1. Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in

which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g). Remand is "particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, 'further findings would . . . plainly help to assure the proper disposition of [a] claim.'" *Kirkland v. Astrue*, No. 06–CV–4861 (ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts*, 388 F.3d at 386) (alterations in original).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court

"must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalaa*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

### 2.    Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing whether a claimant's impairments meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition." *Mongeur*, 722 F.2d at 1037. Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability

testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a. Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.1 (2d Cir. 2013). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i).[7] If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a "severe" impairment restricting his ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix 1 of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues to the fourth step and determines whether the claimant

---

[7] In 2017, new SSA regulations came into effect. The newest regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Ogirri's claims were filed in 2012, the Court applies the regulations that were in effect when Ogirri's claim was filed. *See, e.g.*, *Rousey v. Comm'r of Social Sec.*, No. 16–CV–9500 (HBP), 2018 WL 377364, at *8 n.8 & *12 n.10 (S.D.N.Y. Jan. 11, 2018) (noting 2017 amendments to regulations but reviewing ALJ's decision under prior versions); *O'Connor v. Berryhill*, No. 14–CV–1101 (AVC), 2017 WL 4387366, at *17 n.38 (D. Conn. Sept. 29, 2017) (same); *Luciano-Norman v. Comm'r of Soc. Sec.*, No. 16–CV–1455 (GTS)(WBC), 2017 WL 4861491, at *3 n.2 (N.D.N.Y. Sept. 11, 2017) (same), *adopted by*, 2017 WL 4857580 (N.D.N.Y. Oct. 25, 2017); *Barca v. Comm'r of Soc. Sec.*, No. 16–CV–187, 2017 WL 3396416, at *8 n.5 (D. Vt. Aug. 8, 2017) (same).

has the Residual Functional Capacity ("RFC") to perform his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant can do any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  The burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy.  *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.      Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted).  As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits."  *Sims*, 530 U.S. at 111.  Specifically, under the applicable regulations, the ALJ is required to "develop a complete medical record before making a disability determination."  *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)–(f)).

Whether the ALJ has satisfied this duty to develop the record is a threshold question.  Before determining whether the Commissioner's final decision is

supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09–CV–3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02–CV–5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law."). The ALJ must develop the record even where the claimant has legal counsel. *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Remand is appropriate where this duty is not discharged. *See, e.g., Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c.  Treating Physician Rule

"'Regardless of its source,' the ALJ must 'evaluate every medical opinion' in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11–CV–1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (quoting 20 C.F.R. §§ 404.1527(c), 416.927(c)). A treating physician's opinion receives controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). "The regulations define a

treating physician as the claimant's 'own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant].'" *Henny v. Comm'r of Soc. Sec.*, No. 15–CV–629 (RA), 2017 WL 1040486, at *9 (S.D.N.Y. Mar. 15, 2017) (quoting 20 C.F.R. § 404.1502).  Deference to such a medical provider is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."  20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue*, No. 09–CV–3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  Additionally, where "'the treating physician issue[s] opinions that [are] not consistent with other substantial evidence in the record, such as the opinion of other medical experts,' the treating physician's opinion 'is not afforded controlling weight.'"  *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

To determine how much weight a treating physician's opinion deserves, the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32; *see* 20 C.F.R. § 404.1527(c). If, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 134 (responsibility of determining "the ultimate issue of disability" does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (citations omitted). The regulations require that the Commissioner "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have not hesitated to remand cases when the Commissioner has not provided 'good reasons.'" *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (alterations omitted).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart,* No. 04–CV–7515(DLC), 2006

WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.'" *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether "the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence the ALJ must consider (in addition to objective

medical evidence) are: (1) a claimant's "daily activities; (2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) Factors that precipitate and aggravate the symptoms; (4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." *Pena*, 2008 WL 5111317, at *11 (citing SSR 96–7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

## B.    The ALJ's Decision

In a decision dated July 25, 2014, the ALJ concluded that Ogirri was not disabled from his alleged onset date of August 1, 2012 to the date of the decision. AR at 24.  The ALJ reached this decision after following the five-step inquiry.  At step one, the ALJ determined that Ogirri had not been engaged in substantial gainful employment since the alleged onset date.  *Id*. at 14.  At step two, the ALJ found that Ogirri had a severe impairment: cerebellar degeneration with a diagnosis of marked cerebellar atrophy.  *Id*.  At step three, the ALJ concluded that this impairment did not meet or medically equal the severity of a listed impairment. *Id*. at 15.  The ALJ then made the following finding as to Ogirri's residual functional capacity:

> [Ogirri] can lift/carry and push/pull 10 pounds
> occasionally and less than 10 pounds frequently,
> stand/walk for 2 hours in an 8-hour workday, and sit for 6
> hours in an 8-hour workday. The claimant requires a
> cane for ambulation and cannot climb ladders, ropes, or
> scaffolds, but can occasionally climb stairs and ramps,
> balance, stoop, kneel, crouch, and crawl. The claimant
> cannot work in proximity to moving mechanical parts or
> at high exposed places."

*Id.* at 15. In making this determination, the ALJ concluded that while "[Ogirri's] medically determinable impairments could reasonably be expected to cause the alleged symptoms," Ogirri's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible based on the preponderance of the evidence. . . ." *Id.* at 17.

In making this finding, the ALJ reviewed the medical evidence and evaluated the medical opinions in the record. *Id.* at 17–22.[8] The ALJ accorded Dr. Tse's assessment "little weight" because:

> the underlying treatment notes indicate some
> coordination and gait disturbance but that the claimant
> has been otherwise neurologically and cognitively intact.
> Furthermore, Dr. Tse also ascribed the above limitations
> as of February 2014 with the longitudinal record failing to
> support the extent of limitations for any vocationally
> relevant period of time (or any 12-month period).
> However, the undersigned accepts that the claimant
> suffers from a degenerative impairment that could result
> in greater limitations over time. The current record,
> though, fails to document any period of symptoms or
> findings consistent with Dr. Tse's opinion.

*Id.* at 21–22.

---

[8] The Court does not recount here each of the ALJ's evaluations of opinion evidence. *See id.* at 21–22.

The ALJ afforded more weight to the opinions of Ogirri's consultative examiners. Dr. Finkelstein's opinion was given "considerable weight as to limitations in ambulation but with limited weight accorded to the opined of restrictions in speech," because the "record reflects that the claimant is able to relate adequately and communicate effectively." *Id*. at 21. The ALJ afforded Dr. Graber's opinion "some weight," reasoning that "[t]he assessment as to limitations in walking, climbing, postural activities is supported by the record though the extent of that limitation appears greater than mild." *Id*. The ALJ also gave "significant weight" to a state agency psychological consultant, who did not see Ogirri, because it was "supported by the examinations and observations of record." *Id*. at 22.

In reaching her conclusion that Ogirri's statements were "not entirely credible," *id*. at 17, the ALJ stated that "the claimant has not been placed on medications to address either emotional or cognitive loss with the claimant's recommended treatment involving physical therapy which the claimant is to begin. He has also been referred to the Movement Disorders Clinic with no apparent follow up." *Id*. at 20. The ALJ also noted that the claimant's examination had revealed "no focal neurological deficit," and that the "record also fails to reflect ongoing use of a cane or assistive device." *Id*. The ALJ added that Ogirri had a home aide for a period, but that "the record fails to reflect such assistance for a significant portion of the period at issue." *Id*. While recognizing Ogirri's "diagnosis of marked cerebellar atrophy," the ALJ stated that "some examinations also reflect[ ] that the claimant

[is] neurologically intact and [does] not requir[e] any assistive device" and concluded that, based on the totality of the evidence, Ogirri's "allegations and testimony" would be "accorded limited weight." *Id.* at 21.

At step four, the ALJ concluded that Ogirri is unable to perform his past relevant work. *Id.* at 22–23. At step five, the ALJ concluded that considering Ogirri's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that Ogirri would be able to perform, such as charge account clerk, order clerk, and document preparer, and therefore, Ogirri was not disabled. *Id.* at 23–24.

## C. Analysis

Ogirri argues that there are two reasons why the ALJ's decision should be reversed or remanded for a new hearing: the ALJ failed to properly weigh the opinion of treating physician Dr. Tse, and the ALJ failed to properly evaluate Ogirri's credibility. Pl. Mem. at 9, 13. For the reasons that follow, the Court agrees with Ogirri's first argument and concludes that the ALJ failed to comply with the treating physician rule. As the Court remands the case on that basis, the Court need not reach a conclusion about the ALJ's credibility finding. However, the Court will briefly address the finding to the extent that the ALJ's analysis presents potential problems that she can remedy on remand.

### 1. The ALJ Did Not Comply with the Treating Physician Rule

Ogirri argues that the ALJ failed to properly weigh Dr. Tse's opinion. Pl. Mem. at 9–13. The Commissioner, while recognizing that a treating source's

opinion is entitled to controlling weight except in certain circumstances, contends that the ALJ properly gave little weight to Dr. Tse's opinion. Def. Mem. at 19. Specifically, the Commissioner claims that the opinion was entitled to little weight because it was inconsistent with the opinions of Drs. Finkelstein and Graber, was internally inconsistent, and was issued after only three examinations. *Id.* at 20.

As discussed below, the Court finds that the ALJ did not comply with the treating physician rule because she failed to identify Dr. Tse as a treating physician and she declined to give controlling weight to Dr. Tse's opinion without discussing the required factors or providing good reasons.

### a. In her Decision, the ALJ Failed to Identify Dr. Tse as a Treating Physician

The ALJ's decision does not explicitly identify Dr. Tse as a treating physician. However, during the hearing, Ogirri testified that Dr. Tse was treating him about every month and a half to two months. AR at 70. Indeed, the Commissioner does not contend that Dr. Tse was not a treating physician; her Memorandum of Law tacitly concedes the point. *See* Def. Mem. at 19 (arguing that the ALJ properly gave only little weight to Dr. Tse's opinion and stating that a "treating source's opinion . . . is entitled to controlling weight, but only if the opinion is well-supported . . . and is not inconsistent with other substantial evidence"); *see also Alicea v. Colvin*, No. 14–CV–1998 (PED), 2016 WL 452320, at *14 (S.D.N.Y. Feb. 4, 2016) (finding tacit admission in similar circumstances).

According to SSA regulations, a treating source is an "acceptable medical source who provides [the claimant] with medical treatment or evaluation and who

has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1527(a)(2). Generally, a physician who has examined a claimant on one or two occasions is not considered a treating physician. *See id*. However, there is no minimum number of visits or period of treatment by a physician before this standard is met. *Id*. (ongoing treatment relationship can be established by medical source "who has treated or evaluated [the claimant] only a few times . . . if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)"). "[C]ourts have held that SSA adjudicators should focus on the nature of the ongoing physician-treatment relationship, rather than its length." *Vasquez v. Colvin*, No. 14-CV-7194 (JLC), 2015 WL 4399685, at *20 (S.D.N.Y. July 20, 2015) (internal alteration and quotation marks omitted) (citing *Schisler v. Bowen*, 851 F.2d 43, 45 (2d Cir. 1988) (upholding draft Social Security Ruling clarifying that treating physician's "ongoing" relationship with claimant may be "of a short time span")); *see also Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) ("The nature–not the length–of the [physician-patient] relationship is controlling."); *Vargas v. Sullivan*, 898 F.2d 293, 294 (2d Cir. 1990) (applying treating physician rule where doctor saw patient for only three months).

Based on the evidence in the record, the ALJ ought to have considered Dr. Tse to be a treating physician. Ogirri began his treatment at Mount Sinai in July 2013. AR at 293. There, he saw a primary care physician who referred him for a neurology consultation, *id*. at 295, and the next month, he met with a neurologist who conducted an examination and referred him to Mount Sinai's Movement

Disorders Clinic. *Id.* at 309, 313–14. As a result of that referral, in October 2013, Ogirri began seeing Dr. Tse. *Id.* at 364. Dr. Tse treated Ogirri at least three times before the hearing. *Id.* at 353–54; 364–67; 408–09. Dr. Tse examined Ogirri, diagnosed him with cerebellar degeneration, ordered and reviewed medical tests, reviewed treatment options, referred Ogirri to physical therapy, occupational therapy, and gait training, and scheduled follow-up appointments for further treatment. *Id.* The record indicates that Dr. Tse reviewed the work of her colleagues at Mount Sinai who were also treating Ogirri. *See, e.g.*, *id.* at 375, 553, 582. At Ogirri's third appointment, in addition to performing an examination, she completed an impairment questionnaire. *Id.* at 396–403.[9]

Other decisions have inferred a treating relationship in similar circumstances. In *Nunez v. Berryhill*, for example, a physician who met with the claimant three times over the course of three months was considered a treating source. *Nunez v. Berryhill*, No. 16–CV–5078 (HBP), 2017 WL 3495213, at *23 (S.D.N.Y. Aug. 11, 2017). There, the doctor "wrote an EMG report[,]" "referred plaintiff for the EMG[,]" "noted plaintiff's medical history and the results of the EMG and a physical examination[,]" "diagnosed plaintiff[,]" and "prescribed medication[.]" *Id.* In *Vasquez v. Colvin*, a doctor who met with the claimant four

---

[9] After the hearing but before the ALJ issued her decision, Ogirri returned to Dr. Tse for another follow up visit on July 15, 2014. *Id.* at 576–77. While the notes from that visit are included in the list of exhibits in the record, *see id.* at 575–78; 584–87 (Exs. 28F & 29F), it is not clear whether the ALJ received the evidence before she issued her decision on July 25, 2014. *See id.* at 29 (list of exhibits considered by ALJ that does not include Exs. 28F and 29F).

times was considered a treating physician where he "referred Vasquez to other specialists for further treatment and testing[,]" "wrote a brief note confirming [claimant's] impairments[,]" and was referred to by the claimant as his treating physician. *Vasquez*, 2015 WL 4399685, at *20. In *Harrison v. Secretary of Health & Human Services*, a physician who had seen plaintiff four times was considered a treating source where she "diagnosed plaintiff and referred her for various tests and treatment." *Harrison v. Sec'y of Health & Human Servs.*, 901 F. Supp. 749, 755 (S.D.N.Y. 1995); *see also Snell*, 177 F.3d at 130 (treating relationship found where doctor met with claimant three times); *Vargas*, 898 F.2d at 293 (applying treating physician rule where doctor saw patient for only three months).

Thus, because the record indicates that Dr. Tse evaluated Ogirri, had an ongoing relationship with him, and provided him with treatment, the ALJ should have explicitly identified Dr. Tse as a treating physician and evaluated her opinion accordingly.

### b. The ALJ Failed to Consider Required Factors in Evaluating What Weight to Afford Dr. Tse's Opinion

While she did not explicitly recognize Dr. Tse as a treating physician, the ALJ did evaluate Dr. Tse's opinion and afforded it "little weight." AR. at 21. However, in the four-sentence paragraph setting forth her reasoning, the ALJ failed to consider all of the factors listed in the applicable regulation. *See Burgess*, 537 F.3d at 129 (quoting 20 C.F.R. § 404.1527); *see also Halloran*, 362 F.3d at 32 ("An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to

the opinion."). While the ALJ need not have discussed each factor expressly, it should have been clear from her decision that she <u>considered</u> each factor. *See, e.g.*, *Camacho v. Colvin*, No. 15–CV–7080 (CM) (DF), 2017 WL 770613, at *22 (S.D.N.Y. Feb. 27, 2017) ("[W]hen an ALJ decides to give less than controlling weight to the opinion of a treating source, the ALJ's consideration of each of those factors must be transparent . . . .") (internal quotation marks omitted).

Of the five factors listed in 20 C.F.R. § 404.1527, the ALJ's decision touched, briefly, on one; however, her boilerplate statements otherwise do not constitute meaningful consideration of those factors. First, the ALJ referred to but did not discuss "the consistency of the opinion with the record as a whole." *Halloran*, 362 F.3d at 32; 20 C.F.R. § 404.1527(c)(2)(H). The ALJ stated, in a cursory fashion and without citation to the record, the "current record . . . fails to document any period of symptoms or findings consistent with Dr. Tse's opinion." AR. at 22. The ALJ did not explain how Dr. Tse's opinion was inconsistent with symptoms and findings in the record. In fact, the record includes documentation of both symptoms and findings that are consistent with Dr. Tse's opinion. For example, consultative examiner Dr. Finkelstein, whose opinion to which the ALJ gave "considerable weight," diagnosed Ogirri with cerebellar atrophy and noted "[t]he client has limitations in speech and moderate limitations in ambulation. Also limitations in targeting the upper extremities." *Id.* at 250.

The Commissioner argues without elaboration that Dr. Tse's opinion was "inconsistent with the opinions of Dr. Finkelstein and Graber, and thus, not entitled

to controlling weight." Def. Mem. at 20. The ALJ, however, did not provide this reason in her evaluation. As noted above, Dr. Finkelstein diagnosed Ogirri with cerebellar atrophy, and both Drs. Finkelstein and Graber noted that Ogirri had problems with ambulation. AR. at 249–50, 258. Dr. Finkelstein opined that Ogirri had limitations in speech and moderate limitations in ambulation, *id.* at 250, and Dr. Graber opined that Ogirri had limitations in walking. *Id.* at 258. These doctors' observations and opinions may vary in degree from those of Dr. Tse's, but it is not the law that a treating physician's opinion must be identical to every other medical opinion in the record in order to be accorded controlling weight.

The ALJ made no express mention of the other factors, nor does she appear to have considered them, despite the fact that she was obligated to do so. For instance, the ALJ did not discuss the evidence in support of the treating physician's opinion. *See Halloran*, 362 F.3d at 32; 20 C.F.R. § 404.1527(d). The ALJ did not consider whether Dr. Tse was a specialist in the relevant field, whose opinion would therefore merit particular consideration. *See Halloran*, 362 F.3d at 32; 20 C.F.R. § 404.1527(c)(2)(v). In fact, as a neurologist with a specialty in movement disorders, her specialty was directly relevant to Ogirri's condition.

Nor did the ALJ address the frequency of examination or the length, nature, and extent of the treatment relationship between Ogirri and Dr. Tse. *See Halloran*, 362 F.3d at 32; 20 C.F.R. § 404.1527(c)(2)(H). Given that Dr. Tse had been treating Ogirri for three months and had seen him three times when she provided her opinion, she was likely to obtain a more longitudinal picture of Ogirri's condition

than consultative examiners who saw Ogirri for only a few hours, or than Dr. T.

Harding, who did not examine Ogirri and only reviewed the record as it existed in

April 2013. Furthermore, Dr. Tse consulted laboratory test results and physicians'

notes related to Ogirri's treatment at Mount Sinai, including treatment by

neurologist Dr. Tansy. *See, e.g.*, AR. at 364–65 (referring to Dr. Tansy and to the

results of the MRI he had ordered). The failure to consider the length, nature, and

extent of the treatment relationship is conspicuous: in contrast to the little weight

the ALJ gave to Dr. Tse's opinion, the ALJ gave "considerable" weight to the opinion

of consulting Dr. Finkelstein, "some" weight to the opinion of consulting Dr. Graber,

and relied most heavily on the non-examining agency expert, affording "significant

weight" to Dr. T. Harding's statement. AR. at 21–22. However, "the regulations

clearly warn against reliance on a one-time consultative expert's opinion over the

extensive records of a treating physician." *Castillo v. Colvin*, No. 13–CV–5089 (AT)

(MHD), 2015 WL 153412, at *21 (S.D.N.Y. Jan. 12, 2015).

Where, as here, the ALJ did not address the *Halloran* factors, the Court must

remand the case for further consideration. *See, e.g., Craig v. Comm'r of Soc. Sec.*,

218 F. Supp. 3d 249, 266–67 (S.D.N.Y. 2016) (remanding in part due to ALJ's

failure to consider factors such as specialization, nature of treatment relationship,

and frequency of examination in assessing weight afforded to treating physician's

medical opinion); *Ramos v. Comm'r of Soc. Sec*, No. 13–CV–3421 (KBF), 2015 WL

7288658, at *7 (S.D.N.Y. Nov. 16, 2015) (remanding case where ALJ did not

consider required factors such as specialization and length of treatment in weighing

the opinion of treating physician); *Hidalgo v. Colvin*, No. 12–CV–9009 (LTS) (SN), 2014 WL 2884018, at *20 (S.D.N.Y. June 25, 2014) (ALJ's failure to refer to all factors when explaining weight given to treating psychiatrist's opinion was legal error); *Clark v. Astrue*, No. 08–CV–10389 (LBS), 2010 WL 3036489, at *4 (S.D.N.Y. Aug. 4, 2010) ("ALJ did not consider the frequency of examination and the length, nature, and extent of the treatment relationship, or whether the opinion was from a specialist," which was "legal error [that] constitute[d] grounds for remand") (internal quotation marks omitted).

### c. The Reasons Provided by the ALJ Were Insufficient to Afford Less Than Controlling Weight to the Treating Physician's Opinions

The ALJ explicitly provided two reasons for offering Dr. Tse's opinion little weight: first, because her underlying treatment notes indicated Ogirri was cognitively intact; and second, because Dr. Tse claimed the disability onset date was February 2014, after Ogirri's claimed disability onset date of August 1, 2012. AR. at 21–22. The Commissioner has proffered a third reason that Dr. Tse's opinion should be entitled to little weight, namely, that Dr. Tse's opinion was internally inconsistent. Def. Mem. at 20. These reasons are insufficient to afford less than controlling weight to the treating physician's opinion. Each will be addressed in turn.

### i. Underlying Treatment Notes

The ALJ "accorded little weight" to Dr. Tse's opinion because "the underlying treatment notes indicate some coordination and gait disturbance but that the

claimant has been otherwise neurologically and cognitively intact." AR. at 21–22. This statement, unelaborated upon, mischaracterizes the record.

As an initial matter, whether or not Dr. Tse's treatment notes indicate <u>cognitive</u> dysfunction is irrelevant – Dr. Tse diagnosed Ogirri with a neurological condition (cerebellar degeneration) and opined on his resulting physical limitations.

Furthermore, Dr. Tse's underlying treatment notes indicate far more than merely "some coordination and gait disturbance." The ALJ's statement mischaracterizes Dr. Tse's treatment notes, which include detailed and consistent documentation of Ogirri's symptoms and examination results, and which support her diagnosis and opinion. Dr. Tse's notes include her clinical findings, based on her own neurological evaluations of Ogirri, of symptoms of neurological deficit such as wide-based gait and ataxic finger-to-nose tests. *See, e.g.*, *id.* at 353–54; 364–67; 408–09; 396–403. Dr. Tse's notes also include her analysis of diagnostic examinations, such as Ogirri's September 2013 MRI. *See, e.g.*, *id.* at 365. In the impairment questionnaire that she completed in February 2014, Dr. Tse specifically pointed to these clinical findings and diagnostic tests in support of her diagnosis. *Id.* at 396–97. Thus, as the ALJ's proffered reason "relies on a mischaracterization of the record," it "cannot constitute a 'good reason' for rejecting a treating physician's opinion." *Marthe v. Colvin*, No. 15–CV–6436 (MAT), 2016 WL 3514126, at *7 (W.D.N.Y. June 28, 2016) (ALJ improperly declined to afford controlling weight to treating physician's opinion where ALJ found opinion "somewhat"

inconsistent with physician's treating notes but review of record revealed opinion was consistent with treating notes).

### ii.    Disability Onset Date

The ALJ's statement that "Dr. Tse . . . ascribed the above limitations as of February 2014" is problematic.  AR at 22.  In response to the last question at the end of an eight-page questionnaire that asked "what is the earliest date that the description of symptoms and limitations in this questionnaire applies?," Dr. Tse did write "[n]ow 2/6/14."  *Id.* at 402.  However, while the ALJ proffers Dr. Tse's stated onset date as a reason to afford little weight to Dr. Tse's opinion, she does not explain how the onset date bears on the weight that should be afforded to Dr. Tse's opinion.  In the absence of further elaboration by the ALJ, it is not clear to the Court why the identification of a particular onset date is a reason to discredit Dr. Tse's opinion.

In any event, based on the record and in the context of the questionnaire and also of Dr. Tse's treatment of Ogirri, the Court finds it highly unlikely that Dr. Tse intended to state that Ogirri's symptoms and limitations began on the date she completed the questionnaire.  Dr. Tse had seen and diagnosed Ogirri multiple times before that day.  *Id.* at 353–54; 364–67; 396–403.  Such a response would only make sense if Ogirri's condition had deteriorated since she had last examined him.  Her treatment notes from February 6, 2014 indicate the opposite.  Dr. Tse wrote that Ogirri "has been doing PT which has been helpful," and that he "has no new complaints."  *Id.* at 408.

To the extent that Dr. Tse's onset date was determinative, either of the ALJ's weight evaluation or of her disability finding, the ALJ should have sought clarification from Dr. Tse. *See Sellan v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013) ("To the extent [the] record is unclear, the Commissioner has an affirmative duty to fill any gaps in the administrative record before rejecting a treating physician's diagnosis." (internal quotation marks omitted))*; Vazquez v. Comm'r of Soc. Sec.*, No. 14–CV–6900 (JCF), 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015) (ALJ's "rejection of [the treating source's] opinion without first attempting to clarify any gaps or perceived inconsistencies in the record constituted legal error and grounds for remand.").

### iii.    Internal Inconsistencies

The Commissioner argues that the ALJ was justified in discounting Dr. Tse's opinion because her responses on the impairment questionnaire were internally inconsistent. Def. Mem. at 20. Specifically, the Commissioner contends that that the following inconsistencies support the according of "little weight" to Dr. Tse's opinion: first, that Dr. Tse circled "No" to a question which asked: "[w]ould it be necessary or medically recommended for your patient not to sit continuously in a work setting?" but then opined that Ogirri would need to get up and move around every 30 minutes for 30 minutes, AR. at 398–99; second, Dr. Tse said Ogirri could only stand/walk for one hour out of an eight-hour workday, but needed to "get up and move around" every 30 minutes for 30 minutes, *id*.; and, third, that Dr. Tse answered that Ogirri's condition did not interfere with his ability to keep his neck

in a constant position, but then answered that he would not be able to "do a full time competitive job that requires that activity on a sustained basis." *Id.* at 400–01.

As an initial matter, the ALJ did not articulate these alleged inconsistencies as a reason for discounting Dr. Tse's opinion. *Id.* at 21–22 (discussing reasons for according little weight to opinion). In fact, while the ALJ listed Dr. Tse's responses to the impairment questionnaire in a paragraph detailing the medical opinion evidence in the record, *id.* at 21, at no place in her decision did the ALJ refer to the questionnaire as containing inconsistencies. Assuming *arguendo* that the inconsistencies would constitute a good reason to afford the opinion "little weight," they were not proffered as a reason, and the regulations require that the SSA "give good reasons in its notice of determination or decision for the weight it gives claimant's treating source's opinion." *Clark,* 143 F.3d at 118 (alterations omitted).

Furthermore, even if the ALJ had identified any of the inconsistencies within the impairment questionnaire, they would not necessarily constitute a "good reason" to afford the opinion little weight. Courts often recommend that the ALJ clarify such inconsistencies with the treating physician directly. *See, e.g., McClinton v. Colvin*, No. 13–CV–8904 (CM) (MHD), 2015 WL 6117633, at *23 (S.D.N.Y. Oct. 16, 2015) ("When the evidence in a claimant's record is inadequate for the SSA to make a determination, the ALJ 'will determine the best way to resolve the inconsistency or insufficiency,' and . . . when the information needed pertains to the treating physician's opinion, the ALJ should reach out to that treating source for clarification and additional evidence.") (quoting 20 C.F.R.

§ 416.920b(c)); *Gabrielsen v. Colvin*, No. 12–CV–5694 (KMK) (PED), 2015 WL 4597548, at *6 (S.D.N.Y. July 30, 2015) ("[I]n some cases, the nature of the record may render re-contacting the treating physician the best, if not the only, way to address gaps or inconsistencies in the record, such that it is incumbent upon the ALJ to do so."); *Norman v. Astrue*, 912 F. Supp. 2d 33, 84 (S.D.N.Y. 2012) (finding ALJ should have recontacted treating physician when later opinion conflicted with earlier opinion by same physician). Remanding the case will allow the ALJ the opportunity to solicit such clarification from Dr. Tse.

### d. The Failure to Afford the Treating Physician's Opinion Less than Controlling Weight was Crucial to the ALJ's Rejection of Ogirri's Claim

The question of whether the ALJ properly weighed Dr. Tse's opinion regarding Ogirri's limitations is critical to the resolution of his claim, as the opinion is potentially dispositive of whether Ogirri is disabled. At the hearing, the ALJ asked the vocational expert whether jobs existed for a hypothetical claimant with limitations similar to those that the ALJ said Dr. Tse had found. *Compare* AR at 21 (ALJ's summary of Dr. Tse's opinion); *with id.* at 84 (ALJ asking vocational examiner if jobs existed for claimant with limitations substantially identical to those opined by Dr. Tse). The vocational expert testified that no jobs existed for such a claimant. *Id.* Consequently, it "cannot be said that the ALJ's analysis of [Dr. Tse's] opinion[ ] was harmless error because the vocational expert essentially testified that if the[ ] opinion[ ] were adopted, [Ogirri] would be unable to work." *Pines v. Colvin*, No. 13–CV–6850 (AJN) (FM), 2015 WL 872105, at *10 (S.D.N.Y.

Mar. 2, 2015) (quoting *Archambault v. Colvin*, No. 13–CV–292, 2014 WL 4723933, at *10 (D. Vt. Sept. 23, 2014)) (alterations omitted), *adopted by*, 2015 WL 1381524 (S.D.N.Y. Mar. 25, 2015).

***

Although the law does not require a "slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear[,]" there is no such clarity in this case. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013). Given that the ALJ afforded less than controlling weight to Dr. Tse's opinion without giving "good reasons" and failed to consider all the relevant factors in assigning the weight to the opinion, the Court remands this case for further proceedings. *See, e.g.*, *Hidalgo*, 2014 WL 2884018, at *20 (ALJ's failure to refer to all factors when explaining weight given to treating psychiatrist's opinion was legal error); *Randolph v. Colvin*, No. 12–CV–8539 (LTS) (JLC), 2014 WL 2938184, at *13 (S.D.N.Y. June 30, 2014) ("The ALJ committed legal error by failing to explicitly consider all the required factors.") (citing *Clark*, 2010 WL 3036489, at *4), *adopted by*, Order, dated July 23, 2014; *Ellington v. Astrue,* 641 F. Supp. 2d 322, 330 (S.D.N.Y. 2009) (remanding in part where "the ALJ made no mention of important factors such as the length and the frequency of the treating relationship").

### 2.  The ALJ Should Reevaluate her Credibility Evaluation on Remand

Ogirri also argues that the ALJ failed to properly evaluate his credibility. *Id.* at 13–16. The Commissioner counters that the ALJ appropriately found Ogirri's statements about the intensity, persistence, and limiting effects of his symptoms

were not credible. Def. Mem. at 21. Because the Court concludes that the ALJ did not follow the treating physician rule and remands on that basis, the Court need not decide this issue. The Court will, however, discuss Ogirri's contention to the extent that the ALJ's credibility determination does raise concerns that should be addressed on remand.

While "[i]t is the function of the [Commissioner], not the [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant," *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (alterations in original), the "ALJ's decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the ALJ gave to the individual's statements and the reasons for that weight." *Cichocki*, 534 F. App'x at 76 (internal alternations and quotation marks omitted). As long as the ALJ provides a sufficiently specific rationale for finding a claimant's testimony not credible, the decision is "generally entitled to deference on appeal." *Selian*, 708 F.3d at 420; *see also Wicks v. Colvin*, No. 15–CV–937 (LEK) (ATB), 2016 WL 6110503, at *8 (N.D.N.Y. Oct. 19, 2016) ("An ALJ may properly reject subjective complaints after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.") (internal alterations and quotation marks omitted), *adopted by*, 2016 WL 6106471 (N.D.N.Y. Oct. 19, 2016).

Here, the ALJ found that Ogirri's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that "[Ogirri's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible based on the preponderance of evidence as explained below." AR at 17.

The ALJ began her evaluation by stating that "[Ogirri] has not been placed on medications . . . with the claimant's recommended treatment involving physical therapy, which the claimant is to begin. He has also been referred to the Movement Disorders Clinic with no apparent follow up." *Id.* at 20. However, the ALJ did not explain what about Ogirri's failure to be on medication makes his subjective complaints not credible. Ogirri states that there is no cure for cerebellar degeneration, Pl. Mem. at 15, a statement that is undisputed by the Commissioner. *See* Def. Mem. at 23. Furthermore, the record contradicts the ALJ's statements that Ogirri had not begun physical therapy or followed up with the Movement Disorders Clinic. AR. at 354, 364, 409. In fact, Dr. Tse treated Ogirri at the Movement Disorders Clinic, *See id.* at 549, and Ogirri testified at his hearing that he temporarily stopped attending physical therapy during the winter because it was very hard for him to get around in the inclement weather, but that, subsequently, he resumed therapy. *Id.* at 72.

This is not the only place that the ALJ's evaluation is contradicted by the record. The ALJ stated that Ogirri's examinations have revealed gain and coordination problems, but "no focal neurological deficit." *Id.* at 20. According to

Ogirri, focal neurological signs include an abnormal gait, problems with speech, and problems with fine motor activities. Pl. Mem. at 2. As discussed *supra*, these symptoms were observed by multiple doctors. *See also, e.g.*, AR. at 249, 295, 309, 321, 364. The ALJ also stated that while Ogirri testified to having a home aide for a period, "the record fails to reflect such assistance for a significant portion of the period at issue." *Id.* at 21. However, as the ALJ noted earlier in her decision, *id*. at 16, Ogirri testified that it was an issue with his medical insurance that caused him to end his home aide, rather than a diminishing need for such assistance. *Id*. at 79.

Thus, because the ALJ's credibility assessment contains statements that are contradicted or unsupported by the record, the ALJ should more thoroughly evaluate Ogirri's credibility on remand.

### III.    CONCLUSION

For the foregoing reasons, the Court grants Ogirri's motion for judgment on the pleadings, and remands the case pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the ALJ should evaluate Dr. Tse's opinion as that of a treating physician and reevaluate the weight that should be afforded to the opinion based on the considerations outlined above. To the extent that the ALJ's conclusion remains that "little," rather than controlling, weight should be afforded, the ALJ should provide a comprehensive analysis setting forth good reasons for the weight assigned. The ALJ should also reevaluate Ogirri's credibility in light of all the relevant medical and other evidence.

The Clerk of the Court is directed to close docket entries 8 and 14.

**SO ORDERED.**

Dated: New York, New York
      February 28, 2018

_____
JAMES L. COTT
United States Magistrate Judge